May it please the Court. Good morning, Your Honors. My name is Daniel Lifshitz from Johnson & Johnson, representing the plaintiff and appellant, David Marks. The District Court in this case effectively held that thousands of legacy artists similarly situated to appellant have no recourse should their record labels choose to manipulate, reduce, or entirely eliminate the only significant revenue stream their music still generates. Where did the court hold that? The court held that by ruling that because David Marks's original contract doesn't explicitly provide a royalty for digital streaming, he had no entitlement to those royalties because the nature of the contract only concerned sales of records, which is why when streaming came about, the record labels, in this case Universal Music and Capitol Records, understood that none of those old terms could apply, which is why they didn't even pretend to pay the original record sold royalty rate. Instead, they ad hoc instituted a new royalty scheme completely antithetical to all of the language in the original contracts. Well, counsel, does the original contract apply to streaming? The original contract, we contend, does not because the language... And I think that's what UMG thought as well. So now you're in agreement that the contract doesn't apply. So if the contract doesn't apply, then either you have to sit down and renegotiate the whole thing, or UMG can say, you know, it's pretty clear that something ought to be done here, and this is what we're going to give you. And you can come in and argue that that's not right, but you don't have a contract, so we're not trying to enforce something that you originally agreed to, right? And you seem to agree to that. I mean, I didn't think that you disagreed with that. I agree with the predicate that the original contracts has drafted do not cover streaming. I do not agree that the contracts as currently in effect don't cover streaming. Okay, so let me stop you there because, if I could, forgive me for interrupting, but I think you're arguing, pursuant to Judge Bybee's question, that the parties modified the contract, right? Correct. Okay, and it has to be an applied modification, I think, because we don't see a written one. Correct. Okay, so can you just tell me how did that happen? We've got a contract formation problem, I think. On my scorecard, we've got a contract formation problem. Show me, please, where we have a modified contract. So, under California law, you don't need to point to the exact moment of contract formation in order to have a contract. You have to have a bargain for exchange, right? Correct, and that can be implied through the conduct of the parties. In this case, the record labels instituting a new royalty stream, conveying it to the artists through the payment of royalties, and as reflected on the royalty statements that are sent out to them in order for them to understand what they're being paid upon, and the artists' election to receive those royalties cash the checks and not raise any hackles about how they are being now compensated according to the terms disclosed by the labels. Okay, so you didn't use the word forbearance, but your complaint does. The consideration for this modification is, is it forbearance? It is forbearance, but you don't have to plead a specific legal theory in the complaint. You simply state the legal effect. In this case, the complaint states that they elected not to pursue any legal action in reliance upon the terms being communicated by the record labels. That is fairly characterized as forbearance. Okay, so I'm trying to get to, and this isn't a trick question, I'm concerned about this case, and I'm trying to get to a contract, the formation of a modified contract, and you've explained it without using the word forbearance, and I just want to know if you're relying on forbearance as the consideration for this modification, sir. We are relying on forbearance in that it is fairly classified as forbearance. The way that we framed it in the complaint is that consideration is the abstention of pursuit of a legal claim, and whether that is characterized as forbearance or a change in legal relations, we believe the concepts are fairly fungible, and a number of them could apply. Okay, again, not intended to be a trick question. I'm gonna ask one more question and then get out of the way and let my colleagues ask questions, but what I'd like to know, because I've looked and looked, for any allegation that your client communicated his decision to forbear from suit to the defendants. Not an express communication, but the law in California doesn't require an express forbearance. Implied forbearance is perfectly adequate under controlling California authority, and the Ninth Circuit, I believe, has upheld that broad understanding of forbearance in the MWS case. Okay, so UMG says, we're gonna send you 50%, we're gonna send you a 50% royalty check, and your client cashes the check, sort of an implied acceptance of the contract. So where's the breach? The breach is that they were told on the royalty statements they were receiving a 50% royalty for the streaming monies collected, and there's no indication it is subject to deductions. And when the record labels want to impose deductions, they know it has to be expressly disclosed, otherwise it can't be a term of the agreement. That's why if you turn to his original contract, it says when we sell records... Counsel, you're running, you're running a little fast, and you're sort of blending, you're sort of blending the modification with the original contract. So if they've offered you the 50% deal, and your client is cashing the check, that would seem to indicate that your client was satisfied with what they were receiving. So I still don't understand where the breach is. What term of this new contract is being breached? The 50% figure, because it's not actually 50%. It is 37.5% because they are taking a 25% intercompany charge without ever disclosing it for no work performed. I looked and looked in the second amendment complaint and in the briefing on appeal, and I couldn't figure out where you got 100%. But there is a footnote at ER 38, there's a footnote in your opposition to the motion to dismiss that represents that the royalty statements represent affirmatively misrepresented to your client that he was receiving receiving 50% of 100%. That's where I figured that out. Okay, I think that's your contention. But I don't know when or where or how your client learned that there was some, this intercompany charge being taken off the top. Do we have that in this record? No, because my client was never affirmatively informed by UMG of this. He had to learn it through third-party sources. Once artists began to audit the record labels, they realized this intercompany charge was in place and was being applied across the legacy artist roster. So once he learned through third parties that this practice was in place, he filed his complaint because the royalty statements as subject to any sorts of deductions, any sorts of intercompany charges, which is the standard practice in a record label contract. Okay, thank you. I think you've answered my question, but I have a related one. The 1972 contract is, I think, I think I've got, oh, it's a settlement agreement. It's an amendment. And your brief says, and I think your complaint says that there's nothing that indicates they can take an intercompany charge. But I I'm struggling with that because I think the 1972 settlement agreement says they can up to 10% at their election. That is for records sold. So you always pair the deduction with the form of exploitation. Here they say when we sell records, we can take a 10% deduction on the gross, or we can credit returns of the physical records from the stores to the record label. All of it is tied to the form of exploitation. When they then are disclosed, we're going to be treating this subject to certain deductions, like a 25% intercompany charge. And without expressing that affirmatively, it can't become a term of the contract because it's not been objectively manifested. The only thing that has been conveyed is the 50% figure. But you're the plaintiff. In the trial court, you were the plaintiff, and you're suing on breach of contract. So when you tell me that it's not expressly presented and there isn't a meeting of the minds, that seems to me to be your problem, not opposing counsel's problem. No, there's a meeting of the mind on all terms necessary to form a contract. The consideration being the forbearance, the change in legal relationships on the plaintiff's side, and the consideration being the payment of a streaming royalty on the defendant's side. Now the term of that royalty, as expressed, as disclosed, is 50% with no qualifications. That forms the term of the agreement. If they then in practice... Because of the objective manifestation of what the terms are, yes. It's not a trick question. Are you looking at the royalty statements? Yes, the royalty statement is how they convey the figure. So is it your theory that this is playing out as a whole bunch of individual contracts? One royalty statement at a time? Well, the royalty statement reflects the implied modification of the terms. Right, but it's the contract formation for that implied contract that we're searching for. Yes, the formation would be upon the issuance of the first royalty statement disclosing 50% no deductions. When did that happen? Do we know that on this record? We do not know exactly which the first royalty statement was. We know that it's been continuous throughout the statute of limitations period, and we believe that it is an accruing wrong, that every time that they reaffirm they are paying 50%, they are affirmatively misrepresenting that fact due to the undisclosed intercompany charge. On this record, do we know when or how UMG, your capital, communicated to your client that it was going to morph, that's my word, from vinyl to digital? No, but if you mean by digital something other than streaming, there was no real need to do so because up until streaming, every form of exploitation constituted the sale of a record, even if it was in digital format. Do we know when that change happens? That's what I'm trying to get at. If I'm using the wrong terminology, forgive me, but that's what I need, that date. We would need to obtain all of the royalty statements in discovery to see exactly when it was first implemented. It never had that opportunity, obviously. I'm trying to ask an even more basic question. Was there a communication from the defendants to artists such as your client about this change from the 72 settlement agreement to whatever it is that became the implied modification? Yes, the form of the royalty statements. The statements were the communication. They are sent out to every artist on the roster. Thank you. Is the 50% figure, are you only arguing over foreign streaming revenues? Yes, to the extent that the intercompany charge is only being applied to foreign revenues, but there are reverberations. If UMG had taken a 10% intracompany transfer, would you have a complaint? Yes, insofar as it was not communicated to the artists. But that was actually a term in the prior contract. For the sales of records, which entails a very different set of work being done, which is not applicable to streaming. There is no manufacturer and sale by the record label or its foreign affiliates with the streaming. So the whole premise of the 10% gross deduction ability on record sales has no application to streaming. It's totally disanalogous, which is why they've never attempted to impose it. They instituted a completely new system, a 50% royalty and a 25% intercompany charge, because those old terms were simply inapplicable in intent and in practicality. And the percentage on the prior was 5%? On the prior, can you clarify? On the prior contract, on the original contract. For foreign sales. For foreign sales, I believe I would have to, sorry it's not on the top of my head. I don't have the exact figure at my fingertips. It was 5% and then it was increased to 12% is my recollection. Oh, for the royalty at all, and I believe that included Canada as well. That is the royalty set for the foreign exploitation through sales of records, but that's not what was applied in intent or in practice to streaming. I mean, it's just, I'm, this is a really curious, it's a really curious problem. It's, what's ironic is that the more, the louder that you argue that you're not getting 50% of everything because there's this intercompany, then it just feels like there's no contract. And that you can, you can just, your client should just return the checks and just say there's a failure of consideration here, and I'm going to sue you in some other form of contract, or quantum arrow, or something. We believe that would have been a viable course of action, a rescission action, and that's why the parties agreed to impliedly modify the contracts through their conduct, to avoid that very situation. But I see that my time has run short. I would like to reserve the remainder for rebuttal if at all possible. Did you have anything further? I do have a question. You've brought a declaratory judgment action under California law. It may not matter to our decision, but what is your position on whether that should be under the Federal Declaratory Judgment Act? We believe that whether it's brought under California or the federal statute is irrelevant in practice because both schemes allow for a declaration of future rights and responsibilities, and that's what we would be seeking, irrespective of whether there's been a breach in the past. The parties are at loggerheads as to what the terms of the streaming obligation are going forward, and the declaratory relief under either system would clarify that matter. Okay. Thank you, counsel. Thank you. For your planning purposes, we'll put two minutes on the clock when you come back. I would appreciate that. You're welcome. We'll hear from opposing counsel, please. Good morning, Your Honors. Sean Commons on behalf of the defendant's appellees. The questions the panel's been asking do get at the fundamental issue here, which is that royalty statements are not offers to negotiate, and they're not invitations to unilateral contracts. This court in CFLC in 1999 confronted this exact issue, which is one party mailing forms to another party doesn't amend a contract, and in that context the party mailing the forms actually was trying to. They included express terms saying we're trying to change the contract, and this court said the other side did nothing, didn't communicate back to you. That does not make a contract, and here plaintiff doesn't even allege that there was some kind of content in this royalty statement that would differentiate it from any of the other types of statements we all get in our mail every day. On this record, do we know when or how your clients communicated to Mr. Marks that things were going to change in some way after the 72 settlement agreement? The only allegation in the complaint is that ER 110, it's paragraph 36 of the Second Amendment complaint, where they say that the royalty statements started to reflect credits for foreign streaming at the commencement of foreign streaming. They don't say what the date of that was, but they say once there was foreign streaming, we began to credit them for it. So, right, so it sounds like the answer to my question is no. On this record, we don't know that. We don't have a date other than essentially from the time. But we also don't have any indication of how that communication happened. You know, was a letter written? What happened? Well, so from the complaint, what they're saying is the only communication, the sole and exclusive communication, and this is what they argued below explicitly, is the royalty statement and nothing else. So the 50% figure is the entirety of the communication between the parties. On this record, do we know when or how or why Mr. Marks became aware that he wasn't receiving 50% of foreign, of 100%? No, that's one of the whens we don't have, and I think that was part of what the district court was focused on, on the particularity for fraud is, at what point are you saying you discovered this alleged omission? How is it that it came about? Because one of the issues that the court has already sort of touched on in your questions is, the theory here is that the minute we sent this royalty statement, that somehow the plaintiff had an ability to rescind the contract for frustration of purpose. But they don't claim that when foreign streaming first began, that it was 83% of the market. That's what they say it is today. So on top of all the other uncertainties in this case, essentially it's not only that every royalty statement would have to be a new contract, but at some indefinite point, we don't know, when suddenly streaming goes from being a new technology to taking over as the dominant technology. That's the point in time when they're saying, if I didn't get my 50% on at source, then I'd have a breach of contract claim against you, or a basis to rescind. So the answer to your question is, there's no answers to any of these questions in the complaint. And that's part of what the district court was pointing out, why there cannot be a meeting of the minds here, there can't be a contract. How often are the royalty statements issued? There, at least twice a year, at least twice a year. I'm just gonna ask, are they in the record? They are not. The district court invited them after dismissing the First Amendment complaint to submit one, and they declined to do so. As you noted, Judge Kristen, and there's a reference in one of the briefs, but it's not actually supported by the complaint, and of course it's not in the record. Has your client ever threatened to stop paying royalties? We have not. And that's also, of course, not alleged in the complaint. Does your client deny the existence of a contractual obligation to pay royalties to Mr. Marks? We have a current agreement, the contract is still enforceable. Are you asking about streaming specifically? What are you enforcing? What contract are you enforcing? It's the 1962 contract, as amended by the 1964 amendment, and further amended by the 1972 amendment. Your position is that's a contract? Correct, Your Honor. And what would you say, where would we look for the for the royalty term? Well, the royalty terms are specified in the agreement. Well, I don't know that that's right. Set aside the part that that we don't apparently look to vinyl records anymore. If that's right, and for me that that was actually the lesser leap for me. The 72 settlement agreement talks about, what I referred to earlier, that at defendants elections they can take I think a 10% cut off the top, that's my paraphrase, and the representation from opposing counsels that what is happening is not a 10%. So there are a couple different things here. One of the things that sort of to cut through that, Your Honor, is that as plaintiffs acknowledge in their reply brief, the royalties that are calculated for foreign activities are based on the amounts received in the U.S. That 10% would be an additional deduction if we wanted to take it on top of that, which we don't. So the contract already provides expressly that we calculate royalties on the amounts received in the U.S., and that's the answer to the question of when it says in the royalty statement 50%, the contract already tells them how it's going to be calculated off the amounts we receive. Okay, and again, and I'm not trying to belabor the point, but the contract you're talking about is the 72 settlement agreement. Is that fair? It is, Your Honor. Now, to get directly to your question, I think that you're getting at is that that contract does not expressly address streaming. It does not. As I said, that was the least of my concerns. I had a different problem, but I think you've answered the other problem. But I want to follow up on Judge Christen's question, that I'm still trying to figure out what the contract is. Where does the 50% come from? And if you, if in your next royalty statement said we're gonna pay 45% this time, does Mr. Marks have a cause of action against you for a breach of contract? We would submit he does not, Your Honor. Okay, so you don't think that there is a contract over the 50% term? We don't believe there's a binding contract. We admit that we've been paying a binding contract as to foreign digital streaming that would require us to pay him a 50% royalty rate at source. So you're just a volunteer at this point? That's correct. As to this issue, it is goodwill. You keep using the, I keep thinking you're a lawyer, and then maybe you're not. I apologize. That's okay, but you're saying, a minute ago I asked if you had a, what contract were you enforcing, and I thought I understood the answer, and now there's a different answer in response to Judge Bybee, and then you said, as to this issue, and it sounds real lawyer-y. So could you back up and just tell me what contract do you think your client has with Mr. Marks, as to the royalty calculation? Sorry, if you're asking about a contract generally, and our general obligation to pay royalties for certain activities, we definitely have a binding contract. Okay. If we're talking about digital streaming specifically, and this dispute is only about foreign digital streaming, then there isn't an express requirement in our contract. We do not have a contractual obligation under the 72, the 62, 64, or the 72. We do not have it. Or even a course of dealing over the last couple of years. None of that creates any kind of binding obligation on UMG. Not under California law. And it's been going on for decades? At least a decade. So then let's talk about declaratory relief. Because Mr. Marks had sort of two different theories of declaratory relief, and one of them was, I think, I'm paraphrasing, but I think he sought a declaration that he was entitled to rescind the contract. That's the one that the district court very clearly dismissed, and I'm not talking about. He also, in the alternative, requested declaratory relief to determine his rights under the contract. And I think my colloquy with you just established that perhaps he needs declaratory relief along those lines. But you take the position that he's not entitled to that? That's correct, Your Honor, for a couple reasons. We have the ones in the brief about whether or not declaratory relief is an independent cause of action. To Judge Fitzwater's question, we would think federal law, since it's a federal procedural question, would control here. But if the requirement for declaratory relief at a minimum is some imminent threat, and if the allegation is, as according to plaintiff, we've always paid for domestic streaming at whatever rate he thinks we should be paying it at, and if the court agrees we don't have some contractual obligation to pay foreign digital streaming different than what we've been doing, and we've been doing it since the beginning of time, according to the complaint, and we have not threatened to stop doing it, then where is the imminent issue that requires this court to step in and weigh in on the question? I think you did make the argument in your briefing below that his request for declaratory relief wasn't ripe, and that seems to be what you're arguing now. His request for declaratory relief isn't ripe because you're not threatening to terminate the contract, but in response to Judge Bybee, you've just clarified that you don't think you have a particular obligation to pay a particular percentage, and so I think the hypothetical was, what was your hypothetical? What if he just started dropping the percentage? Correct. Only at that point you think he's entitled to declaratory relief? Well, I think you do have to have a live dispute, and the case that they cited, the Myers v. Sprint case, I know it's a California Appellate Court case, Supreme Court case, but that was the exact type of issue, which was, there was a contract term, and they wanted to sue over it, and the defendant said, I've never enforced it. I've never taken that position in practice. And the California court said, then that's right. Why are we deciding this issue now? If we have not tried to cut the rate below what they say we are somehow now contractually obligated, then what is the court to do? The other reason, though, substantively, is you'd have to think that there's a viable rescission theory here, and we're talking about a contract. No, you wouldn't. No, you wouldn't. He's pled two different requests for declaratory relief. One of them has to do with rescission, and that's the part I'm trying to just set aside. But the other is simply a request that his rights and obligations under the contract be established. Okay. Well, as to that one, then it is just a likeness argument. Okay. Judge Fitzgerald, we haven't let you get in a word in twice. You asked several of the questions I would have, so thank you. Anything further? Not that I know of. Okay. I have to say, I'm really puzzled. I'm really puzzled by the position that you're taking, that there's absolutely no contract whatsoever on the 50% rate, and that you're simply a volunteer at this point. Well, there is a pretty longstanding practice, not just by these defendants, but by other labels with respect to legacy artists, to provide them benefits that may not be required by the contract. So this is not an unusual practice by any means. There's been labels where they will forgive unrecouped balances, essentially advances that have been made to artists back in the day, or pay around those balances, or otherwise adjust rates for them. Have you made, did you put any evidence into the record as to what the industry practice is with respect to streaming for legacy artists? There isn't any in the record, other than plaintiffs have alleged that 50% at source is, they believe that's the going rate. Though they didn't actually, this is one of the points we raised in our brief, which was, they don't actually say what other companies do for intercompany charges. There actually is evidence of it out there in the public record, because there was a settlement with Sony by the same lawyers. The intercompany charge for that one after the settlement is roughly what they're saying ours is here. So there is actually record evidence out there. We have this action, we have the one in Tennessee. Are there any other actions out there that are class actions that might try to resolve all of this for the industry? This is the third case. So aside the Tennessee one, I'm not aware of another one. And you haven't tried to mediate the case or arbitrate or anything else that would come to some kind of a meeting of the minds, an official meeting of the minds, and with a lot of minds? We have not yet had a mediation on these particular issues that I'm aware of, and the three different cases we've had. There was, just briefly with the two minutes, I think one of the things on the frustration of purpose, which is one of the predicates of the claims here for the supposed consideration. And if the concept, there's two requirements. One, it has to be somehow unanticipated. This contract did anticipate technological changes, did so expressly. The other one is that there's somehow the idea that if the parties had, if you went back in time and put them in the position they are today, would they make the deal? And we know what the deal was they would make, because the highest rate they originally negotiated was 5%, and then it went from 5% to 12%. So if according to plaintiff he's receiving 37.5%, it's a little hard to come up with a theory of how that's frustrating the original expectations of the parties back when they originally negotiated this contract to receive three to seven times what was the highest rate he thought he would ever receive for any kind of foreign activity. So for those reasons, and the ones we see in our brief, we would ask that you affirm the district court. I just have one more question. You lingered just one second there, and that's an invitation. Is there any place in this record where your client purports to disclose how that intercompany charge was calculated? The only disclosure is in the contract itself, saying it's going to be paid on the amounts we receive in the United States. Okay. Thank you. Thank you, Your Honor. Thank you. Counsel, we've put two minutes on the clock for you. I'd like to briefly respond to some of the points that were made by opposing counsel. The first is that the CFLC case involved parole evidence interpreting an agreement, not demonstrating antithetical conduct sufficient to impliedly modify the agreement under California law. The second is that you don't need to know exactly when streaming became a monolith for there to have been a legal dispute between the parties as to whether the contracts remained viable. And as the NWS case acknowledges, the claim being foreborn as consideration can be wholly ill-founded and still operate as consideration, does not need to be effective in the moment. The third is that you probably noticed that opposing counsel still won't acknowledge any payment obligation for streaming under any agreement between the parties, which means that tomorrow they could decide to turn the spigot off. And it is nonsensical to claim that these for-profit companies that have public shareholders are simply giving away millions of dollars out of the goodness of their hearts. A shareholder would object to that tomorrow and say, stop spending free money. We're losing money for the shareholders. There has to have been value bargained for, value gained. Otherwise, their conduct would be inexplicable. And that is the imminent threat. If there is found to be in this case no streaming obligation, they can simply stop. If we were to send this back on the declaratory judgment claim and on that claim alone, what would the district judge do? I mean, what is there for the district judge to do? Does the district judge have to decide all of the implied contract questions? They would decide the meets and bounds of the contract by the conduct and whether it's been violated. But wouldn't you have to decide, wouldn't the district judge have to decide whether there was a contract at all? Or do we have to decide whether it's a contract and then send it back? The district court could simply decide whether the quantum of conduct meets the threshold for implied modification, whether there was conduct antithetical to the agreement as written to show deviation. And if you lose that one, then UMG can stop paying you streaming revenues at all. We would also claim that there was a reliance element under the Wagner case, and therefore because they induced reliance upon antithetical conduct, that they have an obligation to abide by what they represented, irrespective of the contract's modifiability or consideration. That's the Wagner case. Anything further? Thank you both for your arguments and for your careful preparations. Very helpful. We'll take this case under advisement. Thank you, Your Honors. Thank you. All rise. Hear ye, hear ye. All persons having had business with the Honorable, the United States Court of Appeals for the Ninth Circuit, will now depart for this session. Stands adjourned.
judges: BYBEE, CHRISTEN, Fitzwater